IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

MARILYN CLEMMONS,        *

    Plaintiff,        *

vs.        *

        CASE NO. 4:15-CV—54 (CDL)

COLUMBUS CONSOLIDATED        *
GOVERNMENT,

        *

    Defendant.

        *

<u>O R D E R</u>

Plaintiff Marilyn Clemmons is a black woman who is employed by Defendant Columbus Consolidated Government ("CCG") as a firefighter.  Clemmons argues that CCG discriminated against her because of her race and gender and retaliated against her for complaining of race and gender discrimination.  She asserts claims under 42 U.S.C. § 1981, the Equal Protection Clause of the Fourteenth Amendment, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*  CCG seeks summary judgment on all of Clemmons's claims.  As discussed below, CCG's summary judgment motion (ECF No. 21) is granted.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of

*material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Clemmons, the record reveals the following.

**I.   Clemmons's Employment, Indictment, and Administrative Leave**

Clemmons is a black woman who has been employed by CCG as a firefighter since 1988. Between 2010 and 2012, Clemmons also worked as a store manager for Big Dawg Calling Card Company. At Big Dawg stores, customers paid money to have points added to a phone card. With those points, customers could play games in the Big Dawg store and win money prizes. In March 2012, based on her involvement with Big Dawg, Clemmons was indicted in Dekalb County, Georgia on three felony counts of violating Georgia's criminal Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO").[1] On March 15, 2012, Clemmons

---

[1] Although Clemmons argues that she was wrongfully accused of violating Georgia RICO, she did not point to any evidence to suggest that any of

was placed on administrative leave with pay; on March 16, 2012, that changed to administrative leave without pay. Clemmons does not know of any other CCG employees who were indicted on felony racketeering charges.

Clemmons did not file a fair treatment report with CCG when she was placed on administrative leave without pay. She did speak with CCG's then-human resources director, Tom Barron, at some unspecified point. According to Clemmons, Barron said that "if all charges are dropped, [Clemmons] shouldn't have no problem [sic] in getting [her] back pay." Clemmons Dep. 235:24-236:1, ECF No. 23. Barron also sent Clemmons's attorney a copy of CCG Policy 220-502. Policy 220-502 contains CCG's disciplinary procedure for employee criminal behavior. Clemmons Dep. Ex. 9, CCG Policy 220-502, ECF No. 23-1 at 120-24. The policy states that if an employee is indicted on felony charges, "then any administrative leave with pay shall convert, upon the date of the indictment, to administrative leave without pay." *Id.* at 4, ECF No. 23-1 at 123. If the employee is not convicted, an administrative investigation is to be conducted, and the results of that investigation "may result in reinstatement, with or without back payment for all or portions of [the] administrative leave without pay." *Id.*

---

the decisionmakers in this case received information to corroborate Clemmons's assessment of the indictment against her.

While Clemmons was on administrative leave without pay, she applied for unemployment benefits. According to Clemmons, CCG initially opposed her unemployment benefits. At the appeal hearing, though, a fire department representative spoke well of Clemmons, and Clemmons was awarded unemployment benefits. Clemmons did not point to any evidence that the unemployment benefits appeal had an adverse impact on her, such as a reduction of her benefits.

## II. **Clemmons's Return to Work and Fair Treatment Report**

The criminal case against Clemmons was dismissed on March 14, 2014. Clemmons was cleared to return to work on March 18, 2014. She was assigned to the training department because her state firefighter certification lapsed while she was on administrative leave. Clemmons Dep. Ex. 7, Letter from Greg Long to Marilyn Clemmons (Mar. 25, 2014), ECF No. 23-1 at 115. Clemmons was given six weeks to pass the recertification test, and she passed on her first attempt. Clemmons does not contend that the recertification requirement was discriminatory. Clemmons does, however, contend that CCG discriminated against her by not informing her of the recertification requirement while she was on leave (before the indictment was dismissed), and she appears to contend that she should have been given more time to prepare for her recertification test.

When Clemmons returned to work, she asked Deputy Chief Mike Higgins for back pay for the two years she was on administrative leave. Higgins referred Clemmons to Chief Jeff Meyer, who told Clemmons that she would not receive back pay. On April 16, 2014, Clemmons submitted a fair treatment report to her supervisor in the training division, Tim Smith, complaining that she had not been given back pay after the charges against her were dropped and that she was required to complete recertification training. Clemmons Dep. Ex. 8, Fair Treatment Report, ECF No. 23-1 at 117-18. In her letter, Clemmons stated that she believed that she had been subjected to "pay discrimination and unfair treatment" as compared to "other employees," though Clemmons did not state what type of discrimination she was alleging. *Id.*

On April 18, 2014, Higgins informed Clemmons that her request for back pay was denied. Clemmons Dep. Ex. 10, Letter from Mike Higgins to Marilyn Clemmons (Apr. 18, 2014), ECF No. 23-1 at 126. Clemmons called CCG's human resources director, Reather Hollowell, to say that she was unsatisfied with Higgins's response. Hollowell contacted Meyer, who informed Clemmons that he would conduct an "additional administrative review" of her fair treatment report and asked her to provide any additional information she wished to present in support of her request for back pay. Clemmons Dep. Ex. 11, Letter from

Jeff Meyer to Marilyn Clemmons (Apr. 29, 2014), ECF No. 23-1 at
128.   Clemmons wrote Meyer a letter stating that the charges
against her were dropped following a motion to suppress hearing
because after the hearing the state lacked evidence to show that
Clemmons and her Big Dawg colleagues were "doing illegal
gambling."   Clemmons Dep. Ex. 12, Letter from Marilyn Clemmons
to Jeff Meyer (May 9, 2014), ECF No. 23-1 at 130.   Clemmons also
noted that a fellow firefighter, D.M.,[2] "received a charge, a DUI
and the obstruction of an officer, and continued employment at
the fire station until verdict."   *Id.*

     Meyer responded to Clemmons's letter on May 16, 2014.   He
determined that the denial of back pay was not unfair treatment;
his staff "confirmed that no employee indicted on felony charges
was granted back pay after returning to work."   Clemmons Dep.
Ex. 13, Letter from Jeff Meyer to Marilyn Clemmons (May 16,
2014), ECF No. 23-1 at 133.   Meyer stated that Clemmons's May 9
letter did not contain any new information to support her
position that she should be awarded back pay.   *Id.*   Meyer also
determined that the fire department followed CCG Policy 220-502,
found that the state firefighter certification requirements were
administered fairly, and informed Clemmons that her retirement
benefit had not been impacted.   *Id.*   Though Clemmons asserts

---

[2]The Court finds it unnecessary to refer to certain non-parties and
non-decisionmakers by their full names.   Therefore, throughout this
order, several individuals are identified using only their initials.

that she tried to reach Hollowell by telephone regarding her back pay request, Clemmons did not point to any evidence that she pursued an appeal in writing to Hollowell or to CCG's personnel review board.   Clemmons also asserts that she was never provided with a copy of any investigation regarding her request for back pay.

**III. Clemmons's Return to Station 14 and Assignment to Station 4**

On May 1, 2014, Clemmons was reassigned from the training division to her old station—Station 14.   When she returned to Station 14, she found that her equipment, locker, and bed were no longer where they had been in 2012.   Clemmons contends that CCG employees did not follow proper procedures when they moved her belongings.   Clemmons asserts that some things were missing from her locker, but she did not say what items were missing. Clemmons also asserts that other firefighters had slept on her personal mattress.   Clemmons does not dispute that when a fire department employee purchases a mattress, all fire department employees who are assigned to the same station have access to the mattress and can use it.   Clemmons verbally complained to her supervisor, Lieutenant Clifton Wherry, that her belongings had been moved and that her mattress had been used, but she did not file a written complaint or a fair treatment report.

On August 11, 2014, Clemmons was assigned to Station 4. CCG asserts that Clemmons was assigned to traveling duty because

Station 4 was short-staffed.  Clemmons maintains that she was transferred because her battalion chief wanted her out of his battalion for some undisclosed reason.  Clemmons Dep. 126:13-18. The Station 4 battalion chief, Janice Bruner, called the Station 14 battalion chief, Bobby Dutton, and informed him that Clemmons was upset about the assignment to Station 4.  Dutton had Wherry direct Clemmons to return to Station 14 on the following shift. Wherry Dep. 99:7-100:12, ECF No. 24.  Clemmons states that she asked Wherry why she had been sent to Station 4; according to Clemmons, Wherry replied that he could not keep five people on Squad B at Station 14 and that he had to move someone.  Clemmons Dep. 140:21-142:16.  After Clemmons returned to Station 14 following her one shift at Station 4, there were five people on Squad B at Station 14 for a while.

In February 2015, Wherry presented Clemmons with three options: remain at Station 14, transfer to Station 4, or transfer to Station 5.  Clemmons opted to stay at Station 14, so another firefighter was transferred to Station 4.  With the exception of Clemmons and Wherry, all of the employees who were assigned to Station 14 in 2014 were ultimately transferred to a different station or position.

**IV.  Perceived Harassment**

Clemmons contends that she was subjected to harassment by Wherry and two coworkers.  Clemmons pointed to evidence that

Wherry made statements to "other guys" suggesting that he had "a
complex against womens [sic] in the fire department."  Clemmons
Dep. 59:1-6; *accord id.* at 71:22-72:12 (testifying that Wherry
stated that a female firefighter performed badly on a car fire
and needed to be retrained after she had been on a lengthy
military leave).  Clemmons also alleges that Wherry made
unspecified derogatory comments about women and their
performance as firefighters and also stated his discomfort with
women drivers.  Clemmons Am. Aff. ¶ 35, ECF No. 31.  Clemmons
did not point to any evidence of when Wherry made these
statements.

Clemmons claims that she was harassed by D.J.  She pointed
to evidence that D.J., an engineer who is no longer employed at
the fire department, stated in her presence that he believed
that women should not work in the fire department.  Clemmons
Dep. 61:22-62:8.  It is not clear from the present record who
D.J. is, whether he was a supervisor, when he made this
statement, or whether Clemmons complained about the statement to
anyone.

Clemmons further contends that in 2012, before she was
placed on administrative leave, C.D. harassed her.  *Id.* at
71:13-16.  She testified that he "would make little jokes about
womens [sic]" and once stated that women should be at home,
barefoot and pregnant.  *Id.* at 70:11-19.  When Clemmons returned

to work in 2014, C.D. was no longer in her squad.  *Id.* at 71:19-
21.

**V.   Clemmons's Sick Leave and EEOC Charge**

Beginning on August 20, 2014, Clemmons exercised her sick
leave due to anxiety issues.  In September 2014, Clemmons tried
to return to work, but she had a doctor's note stating that she
was incapable of driving a fire truck or an ambulance.  *Id.* at
57:10-23.  Clemmons acknowledges that one of her major duties as
a firefighter is to drive the fire truck.  *Id.* at 56:23-24.
Because Clemmons could not drive a fire truck, she asked to be
placed on light duty.

Under the CCG fire department's policy, an employee with "a
long-term illness or medical condition may apply for light duty
in writing when their all [sic] sick leave, vacation, comp time,
et cetera, is reduced to 10 days remaining."  *Id.* at 322:13-19.
There is an exception to this rule for employees who are injured
while on duty as a result of duty-related activities.  *See* Pl.'s
Resp. to Def.'s Mot. for Summ. J. Ex. L, Light-Restricted Duty
Assignment Policy, ECF No. 30-2 at 16.  Clemmons argued to Chief
Thomas Streeter, the fire department's deputy chief of
operations, that her anxiety was caused by harassment she
suffered while on the job, so it should be categorized as an on-
duty injury.  Chief Streeter, however, determined that
Clemmons's anxiety was an off-duty injury.  Clemmons did not

10

file a fair treatment report about this issue, and she did not point to evidence that she complained to anyone but Streeter about this issue.

Clemmons does maintain that a white female employee who suffered from anxiety, L.G., was not required to exhaust any of her leave time to go on light duty. Clemmons Am. Aff. ¶ 32. Clemmons did not point to any other evidence about L.G.'s situation—like the root of L.G.'s anxiety (*e.g.*, whether it was related to injuries suffered at work or was related to something else) or whether LG was permitted to go on light duty solely because of anxiety.

On August 27, 2014, Clemmons hand delivered a letter to the Equal Employment Opportunity Commission ("EEOC") and met with an EEOC investigator. She did not deliver a copy of that letter to anyone at CCG. Clemmons filed a charge of discrimination with the EEOC on October 22, 2014.

## VI.  Clemmons's Return from Sick Leave

Clemmons returned from sick leave on January 2, 2015. After she returned, Clemmons was required to complete and pass her annual pump training, which is required of all firefighters. Clemmons passed the training. Clemmons believes that certain firefighters who were temporarily assigned to Station 14 did not have to complete and pass the training at Station 14. Clemmons

did not point to evidence of whether they completed and passed the training at their home stations.

When she returned from sick leave, Clemmons continued to experience anxiety about driving the fire truck, and her supervisor, Wherry, was aware of this fear. Wherry required Clemmons to complete additional driver training. Wherry took Clemmons to a church parking lot on a number of occasions so that Clemmons could practice driving the fire truck and gain confidence. Clemmons Dep. 59:19-60:16; Wherry Dep. 49:17-50:10. Wherry explained that he provided this additional training to Clemmons so that she could get more comfortable driving the fire truck. According to Wherry, Clemmons did well during the training and became more confident with her driving. Clemmons did not point to evidence of any other employees who expressed a fear of driving the fire truck but were not required to take additional driving training.

Clemmons did not file a fair treatment report about the annual pump training or the extra driving training.

## VII. Additional Issues

There are four restrooms at Station 14. Clemmons was required to clean two restrooms. The other firefighter on her squad, a white male, was required to clean the other two restrooms.

At some point, Wherry became aware that Clemmons had made a complaint of discrimination.  Clemmons did not point to evidence of which complaint (the April 2014 fair treatment report or the October 2014 EEOC charge) Wherry became aware of or when he became aware of it.  She does assert that Wherry, along with Captain Karl Kinslow, attempted to ask her questions about her case at a meeting in March or April 2015, but she told them that she could not discuss it.  Clemmons believes that Kinslow and Wherry called the meeting "to be nosy."  Clemmons Dep. 207:23-24.  Sometime after the meeting, Wherry told Clemmons that he thought she would probably lose the case.

**VIII.    Clemmons's Claims**

Clemmons filed this action on April 10, 2015, alleging claims against CCG under Title VII, § 1981 (through § 1983) and the Constitution's Equal Protection Clause (through § 1983). She claims that CCG discriminated against her based on her race and/or gender and that CCG retaliated against her for complaining of discrimination.  That discrimination and/or retaliation occurred when CCG:

1.  Placed Clemmons on leave without pay in March 2012 (race and gender).

2.  Initially opposed Clemmons's request for unemployment benefits (race).

13

3.   Failed to give Clemmons sufficient time to complete her recertification (race, gender, and retaliation).

4.   Moved Clemmons's belongings while she was on administrative leave (race and gender).

5.   Denied Clemmons's request for back pay when she returned to work in 2014 and failed to provide her with a copy of the investigative report regarding her back pay request (race, gender, and retaliation).

6.   Required Clemmons to travel to Station 4 (race, gender, and retaliation).

7.   Required Clemmons to exhaust all but ten days of her accrued leave before being assigned to light duty and refused to clear her for full duty (race, gender, and retaliation).

8.   Required Clemmons to complete additional training (race, gender, and retaliation).

9.   Required Clemmons to clean two bathrooms at the fire station (race and gender).

10.   Subjected Clemmons to harassment (race and gender).

11.   Tried to question Clemmons about this matter (gender).[3]

---

[3] Clemmons also asserts that CCG retaliated against her for having a picture of a weapon.  She did not point to any evidence on this point. She did not explain how she was retaliated against, when it happened, or how the alleged retaliation was causally related to her protected activity.  This claim thus fails.

DISCUSSION

Clemmons claims that CCG intentionally discriminated against her based on her race in violation of Title VII, § 1981, and the Equal Protection Clause. She also asserts that CCG intentionally discriminated against her based on her gender in violation of Title VII and the Equal Protection Clause. And she contends that CCG retaliated against her for complaining of race and gender discrimination, in violation of Title VII, § 1981, and the Equal Protection Clause.

## I.   Proof Required for Clemmons's Claims

Clemmons's discrimination claims "require proof of discriminatory intent." *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016). For her discrimination claims, she must also prove that she was "subjected to an adverse employment action," meaning that she suffered "a serious and *material* change in the terms, conditions, or privileges of employment." *Medearis v. CVS Pharmacy, Inc.*, 646 F. App'x 891, 897 (11th Cir. 2016) (per curiam) (quoting *Davis of Town Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)).

Clemmons's retaliation claims require proof of retaliatory intent. *See Trask*, 822 F.3d at 1193-94. Clemmons must also prove that "(1) [she] engaged in statutorily protected conduct; (2) [she] suffered an adverse employment action; and (3) the

adverse action was causally related to the protected expression." *Id.* For retaliation claims, "adverse employment action" (often called a "materially adverse action") means an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

A plaintiff may prove discrimination and retaliation with direct or circumstantial evidence. "Direct evidence is evidence that establishes the existence of discriminatory [or retaliatory] intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). So, if a decisionmaker tells an employee, "I am firing you because you're a man," that would be direct evidence of discrimination. In contrast, "remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Id.* Here, Clemmons argues that she presented direct evidence of discrimination because she presented evidence that her supervisor, Wherry, made unspecified derogatory comments about women to unspecified individuals at an unspecified time. But she did not point to evidence that these remarks were related to Wherry's decisionmaking process with regard to Clemmons, so these remarks are not *direct* evidence of

discrimination.  Neither are the 2012 comments of C.D., who did not make any decisions related to this case and was no longer in Clemmons's squad when she returned to work after her administrative leave.  Thus, Clemmons must rely on circumstantial evidence to establish her claims.

At the summary judgment stage, where, as here, the plaintiff depends solely on circumstantial evidence of discriminatory or retaliatory intent, the "courts apply the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Trask*, 822 F.3d at 1191.  Under that framework, a plaintiff must "create an inference of discrimination through her prima facie case." *Id.*  To establish a prima facie case of discrimination to avoid summary judgment, an employee must point to evidence that creates a genuine factual dispute on the following elements: (1) she is a member of a protected class, (2) she was qualified to do the job, (3) her employer subjected her to an adverse employment action, and (4) her employer treated similarly situated individuals outside of her protected class more favorably. *Id.* at 1192.  To establish a prima facie case of retaliation to avoid summary judgment, an employee must point to evidence that creates a genuine factual dispute on the following elements: (1) the employee engaged in statutorily protected conduct; (2) the employee suffered a materially adverse employment action; and

(3) "the adverse action was causally related to the protected expression". *Id.* at 1193-94.

Once the plaintiff establishes a prima facie case, the employer may articulate "one or more legitimate non-discriminatory reasons for its action." *Id.* at 1191 (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)). If the employer does so, then the plaintiff must "produce evidence that the employer's proffered reasons are pretext for discrimination." *Id.*

With these standards in mind, the Court evaluates each of Clemmons's claims.

## II.  2012 Placement on Administrative Leave Without Pay

Clemmons claims that CCG discriminated against her based on her race and gender when it placed her on administrative leave without pay in 2012.  Clemmons does not dispute that she was placed on administrative leave without pay in 2012 under CCG Policy 220-502.  Although Clemmons takes issue with CCG's 2014 decision not to award her back pay for the time she was on administrative leave, she does not appear to contend that CCG's initial decision to place her on leave without pay under CCG Policy 220-502 was discriminatory.  And she did not point to any evidence that CCG was motivated by a discriminatory animus, such as evidence that "her employer treated similarly situated employees who were not members of her protected class more

18

favorably." *Summers v. City of Dothan*, 444 F. App'x 346, 347–48 (11th Cir. 2011) (per curiam).   Clemmons did not point to evidence of any other employees who were indicted on felony charges but were not placed on administrative leave without pay. Clemmons has failed to point to any evidence that would support a prima facie case, and CCG is entitled to summary judgment on Clemmons's claims based on CCG's 2012 decision to place her on administrative leave without pay.

## III. CCG's Opposition to Clemmons's Unemployment Benefits

Clemmons asserts that CCG unnecessarily appealed her application for unemployment benefits and that the appeal was discriminatory.   She pointed to evidence that CCG stated that the "reason for separation" was Clemmons's "failure to follow rules, orders, or instructions."   Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. I, Reason for Separation Inquiry, ECF No. 30-2 at 4.   But at the hearing on the appeal, a CCG representative said positive things about Clemmons, and she was awarded unemployment benefits.

Clemmons has the burden to establish that she suffered an adverse employment action that was motivated by a discriminatory animus.   With regard to her claims based on her unemployment benefits, Clemmons did not point to evidence to satisfy either requirement.   She did not point to any evidence that she suffered a serious and material change in the terms of her

employment based on CCG's initial opposition to her unemployment application; she did not point to any evidence that CCG's unemployment benefits appeal had an adverse impact on her, such as a reduction of her benefits.   Moreover, Clemmons did not point to any evidence that CCG acted with a discriminatory motive when it appealed her application for unemployment benefits; she did not point to any evidence that CCG initially opposed her application for unemployment benefits because of her race or gender.   For these reasons, the Court concludes that Clemmons failed to present sufficient evidence to support a prima facie case on her claims related to CCG's initial opposition to her unemployment benefits application.   CCG is thus entitled to summary judgment on these claims.

**IV.   Recertification Requirement**

Clemmons contends that CCG discriminated and retaliated against her by giving her only six weeks to take her recertification test.[4]   Clemmons does not appear to argue that the recertification requirement itself was invalid.   Clemmons did not point to any evidence that similarly situated employees who had to take a recertification test to reinstate their state firefighter certification were given more time than she was. She did not point to any evidence of who decided how long to

---

[4] Based on Clemmons's response brief, it appears that Clemmons has abandoned this claim.   Clemmons did respond to CCG's fact statements on this issue, though, so the Court will evaluate the claim.

give Clemmons to take her recertification test, whether Clemmons
had engaged in protected activity before the decision was made,
or whether the person who made the decision knew of any
protected activity.  And Clemmons did not point to any evidence
that the six-week period was inadequate for a firefighter with
more than twenty years of experience on the job.  She passed the
test on her first attempt.  In sum, Clemmons did not establish a
prima facie case: she did not show that CCG acted with a
discriminatory or retaliatory motive in giving Clemmons six
weeks to complete her recertification test, and she did not show
that CCG's failure to give her more time constituted an adverse
employment action or a materially adverse action.  CCG is thus
entitled to summary judgment on Clemmons's claims related to the
recertification requirement.

**V.   Movement of Clemmons's Belongings**

It is undisputed that Clemmons's belongings were moved
while she was on administrative leave.  Clemmons claims that
Wherry permitted her belongings to be moved and that the move
amounted to gender discrimination.  She also contends that
several male firefighters were on some type of leave for at
least two years but their belongings were not moved.  She did
not provide any details to show that these firefighters were
similarly situated to her, such as where the male firefighters
were stationed, why they were on leave, or who their supervisor

21

was.   Thus,   the   present   record   does   not   establish   a
discriminatory motive for moving Clemmons's belongings.   Even if
it did, the movement of Clemmons's belongings was not a serious
and material change to the terms, conditions, or privileges of
her employment and was thus not an adverse employment action.
For these reasons, the Court concludes that Clemmons failed to
establish a prima facie case on her claims related to the
movement of her belongings, and CCG is entitled to summary
judgment on these claims.

**VI.   Denial of Back Pay**

Clemmons   argues   that   CCG   employees   discriminated   against
her based on her race and gender in deciding to deny her request
for back pay.   She also contends that the denial was in
retaliation for her submission of the Fair Treatment Report.
The fire department's final decision on Clemmons's back pay
request was made by Meyer, so the Court must determine whether
Clemmons presented sufficient evidence to create a genuine fact
dispute   on   whether   Meyer   acted   with   discriminatory   or
retaliatory intent.

A.   <u>Discrimination Claims</u>

With regard to Clemmons's discrimination claims, she
attempts to establish discrimination by showing that she was
disciplined more harshly than white and male employees for
similar misconduct.   "When a plaintiff seeks to show that he is

similarly situated to an employee who was treated more favorably, he must show that he and the comparator are 'similarly situated in all relevant respects.'" *Robinson v. Colquitt EMC*, 651 F. App'x 891, 896 (11th Cir. 2016) (per curiam) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "In cases involving discriminatory discipline, [the courts] consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.*

Clemmons relies on the following comparators to establish her back pay discrimination claim: O.G. and T.W.[5]  Clemmons asserts that O.G. was charged with assault and stalking in 2015 and continued to receive pay while he was incarcerated for twenty-eight days while the charges were pending.  Clemmons Am.

---

[5] CCG posited that Clemmons would attempt to argue that D.B., M.B., K.D., and D.M. are also similarly situated comparators.  Clemmons did not point to evidence regarding the conduct or discipline of these employees, so the Court concludes that she is not attempting to rely on them as comparators.  Clemmons did point to a chart that lists fire department employees, their alleged criminal offenses, and the corrective action; CCG does not appear to object to it.  Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. M, ECF No. 30-2 at 18.  According to the chart, D.M., D.B., and M.B. were arrested on various misdemeanor charges.  The chart does not contain any information about K.D.  There is no indication that any of these individuals were indicted on felony charges like Clemmons was.  That alone is sufficient to establish that they were not similarly situated to Clemmons.  Moreover, two of the individuals—D.M., a white male, and D.B., a black male, were terminated by the fire department—a punishment harsher than Clemmons's administrative leave without pay.  After the fire department decided to terminate D.B., he appealed to CCG's personnel review board and was reinstated but demoted.  Clemmons did not appeal to the personnel review board; a different decisionmaker was responsible for her discipline, so D.B. is not a suitable comparator.

Aff. ¶ 12.  Clemmons did not point to any evidence that O.G. was indicted on felony charges,[6] and she did not point to any evidence of the details regarding the disposition of O.G.'s charges or the discipline he received.[7]  Being charged with two misdemeanors is not the same as being indicted on three felony charges, so the Court concludes that Clemmons was not similarly situated to O.G. and that O.G. is thus not a suitable comparator.

Clemmons also maintains that T.W., a black male sergeant, was granted partial back pay after he was charged with felony aggravated assault.  In support of this assertion, Clemmons pointed to the chart of fire department employees, their alleged criminal offenses, and the corrective action.  Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. M, ECF No. 30-2 at 18.  The chart shows that T.W. was charged with felony aggravated assault; he was placed on administrative leave without pay on January 14, 2007 and terminated on April 29, 2008.  *Id.*  Thus, the fire department's response to T.W.'s felony charge was more severe than its response to Clemmons's felony indictment.  CCG's personnel review board—a different decisionmaker—overturned the termination "with back pay Retro 60 days" on June 14, 2008, and T.W. resigned on June 16, 2008.  *Id.*  Clemmons did not point to

---

[6] Stalking is a misdemeanor under Georgia law.  O.C.G.A. § 16-5-90(b).  So is simple assault.  O.C.G.A. § 16-5-20(b).

[7] O.G. is not listed on the chart of employee criminal offenses and discipline that Clemmons submitted.

any evidence of the basis for the personnel review board's decision or to any evidence of the disposition of the charges against T.W.  Clemmons also did not appeal to the personnel review board regarding the fire department's denial of her back pay request.  Clemmons is not similarly situated to T.W. given that (a) the fire chief's discipline decision for Clemmons was not as harsh as his discipline of T.W. and (b) the personnel review board, not the fire chief, made the ultimate decision with regard to T.W.'s discipline but not Clemmons's. "[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001).  For these reasons, the Court finds that Clemmons has not established a prima facie case of disparate discipline, and CCG is entitled to summary judgment on Clemmons's denial of back pay claim.

In addition to her complaint regarding the denial of back pay, Clemmons also complains that she did not receive a copy of investigative reports that were completed in 2012 and 2014.  But she did point to evidence that she received a letter from Meyer in 2012 stating that "an initial administration investigation ha[d] been completed concerning the nature of the charges filed against you by the Georgia Bureau of Investigation."  Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. C, Letter from Jeff Meyer

to Marilyn Clemmons (Mar. 16, 2012), ECF No. 30-1 at 10.  The letter further states that Meyer received information from the Dekalb County superior court that Clemmons had been arrested and indicted on three felony counts for violating Georgia RICO. Clemmons also pointed to evidence that she received letters from Higgins and Meyer in 2014 explaining the reasons why she had been placed on leave and why her request for back pay had been denied.  *E.g.,* Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. G, Letter from Jeff Meyer to Marilyn Clemmons (May 16, 2014), ECF No. 30-1 at 18.   In other words, these letters appear to summarize the investigations taken by the fire department in determining whether to place Clemmons on administrative leave without pay.  Even if there was some additional investigation document that the fire department did not provide, the Court is not convinced that the failure to provide such a document is an adverse employment action or a materially adverse action, particularly given that the fire department gave several detailed explanations of its decision to deny Clemmons's request for back pay.  Thus, to the extent Clemmons attempts to base any claims on the fire department's alleged failure to provide her with a copy of its investigation, CCG is entitled to summary judgment on those claims.

B.   Retaliation Claims

Clemmons contends that Meyer's ultimate decision to deny her back pay request was in retaliation for her Fair Treatment Report.  Again, to establish a claim of retaliation, Clemmons "must prove that she engaged in statutorily protected activity, she suffered a materially adverse action, and there was some causal relation between the two events." *Wells v. Gen. Dynamics Info. Tech. Inc.*, 571 F. App'x 732, 736 (11th Cir. 2014) (per curiam).  Statutorily protected activity includes opposition to a practice prohibited by Title VII, § 1981, or the Equal Protection Clause.  *Id.*  In her fair treatment report, Clemmons stated that she had been subjected to "pay discrimination and unfair treatment."  Fair Treatment Report, ECF No. 23-1 at 118. She stated that she was appealing "what are clearly unfair actions and inconsistent discipline (i.e. other employees can work with convictions and lose no pay or firefighter certification)."  *Id.*  She referenced the EEOC and stated that she "strongly believe[d]" that she was "discriminated against." *Id.*  Nowhere in her Fair Treatment Report did Clemmons state that she believed she was discriminated against based on some protected characteristic, such as her race or gender.  Thus, the Court is skeptical that her Fair Treatment Report constituted protected activity—opposition to a practice prohibited by the employment discrimination laws.  But as explained below, even if

it did, she has failed to point to evidence to create a genuine factual dispute on the issue of whether CCG's non-retaliatory reason for denying her back pay was pretextual.

The Court does find for purposes of deciding the present motion that Clemmons's follow-up letter to Meyer was protected activity.   In that letter, Clemmons notes that another firefighter was charged with DUI and obstruction of an officer but kept his job "until verdict."   Letter from Marilyn Clemmons to Jeff Meyer (May 9, 2014), ECF No. 23-1 at 130.   Though Clemmons's letter does not explicitly state that she is complaining of racial or gender discrimination, she is asserting that a white male firefighter remained on-the-job after being charged with two misdemeanors while she, a black female, was placed on administrative leave without pay after being indicted on felony charges.   The Court is satisfied that a reasonable factfinder could construe this letter, in context, as opposing gender and race discrimination.

Not long after Clemmons sent her Fair Treatment Report and her follow-up letter, Meyer issued his final decision upholding the denial of back pay.   Based on this very close temporal proximity and the fact that Meyer's decision was in direct response to Clemmons's Fair Treatment Report and follow-up letter, a reasonable factfinder could conclude that Meyers's decision was causally related to Clemmons's correspondence

28

regarding her back pay request—this is enough to establish a prima facie case of retaliation.

CCG presented a non-retaliatory reason for Meyer's decision to uphold the denial of back pay: CCG Policy 220-502 did not require CCG to award any back pay, and based on the research of Meyer's staff, the fire department had never awarded back pay to an employee who returned to work following an administrative leave due to an indictment on felony charges. Clemmons must present evidence to show that this proffered non-retaliatory reason is pretext for retaliation. *See Trask*, 822 F.3d at 1194 (noting that the plaintiff has the burden to prove "that the reason provided by the employer is a pretext for prohibited, retaliatory conduct") (quoting *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001))). To show pretext, Clemmons must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence" and conclude that retaliation is the real reason for the decision. *McCann v. Tillman*, 526 F.3d 1370, 1375–76 (11th Cir. 2008) (quoting Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004) (*overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)).

29

Clemmons asserts that the CCG personnel review board's decision to award partial back pay to T.W. following his termination and just before his resignation is enough to establish a fact question on pretext. Again, Clemmons did not appeal the denial of back pay to the personnel review board; her case involved a different decicionmaker than T.W.'s case. Clemmons did not point to any evidence that the fire department ever awarded full back pay to an employee who was indicted on felony charges, and she did not point to any evidence that Meyer knew about the CCG personnel review board's 2008 decision to award partial back pay to T.W. For these reasons, the Court finds that Clemmons has failed to point to evidence that creates a genuine factual dispute regarding whether CCG's stated reason for denying her back pay was a pretext for retaliation. And Clemmons did not present any other evidence that would permit a factfinder to infer intentional discrimination or retaliation with regard to her request for back pay. CCG is thus entitled to summary judgment on these claims.

## VII. Temporary Assignment to Station 4

Clemmons argues that her August 11, 2014 temporary assignment to Station 4 was discriminatory and retaliatory. As discussed above, Clemmons was assigned to Station 4 for one shift. When she complained about the assignment, she was returned to Station 14.

Clemmons's discrimination claims based on the temporary assignment to Station 4 fail because the assignment was not an adverse employment action. "A work reassignment may constitute an adverse employment action when the change is 'so substantial and material that it . . . alter[s] the terms, conditions, and privileges of employment.'" *Trask*, 822 F.3d at 1194 (alterations in original) (quoting *Davis,* 245 F.3d at 1245). Clemmons did not submit any evidence to demonstrate that her temporary assignment for a single shift was so substantial and material that it altered her terms, conditions, and privileges of employment. Her discrimination claims based on the temporary assignment thus fail.

Clemmons's retaliation claims based on the temporary reassignment also fail. Clemmons asserts that the fire department temporarily assigned her to Station 4 in retaliation for her Fair Treatment Report, which she filed in April 2014 and supplemented on May 9, 2014. Clemmons did not point to any evidence that Dutton and Wherry—who she contends were responsible for the assignment—knew about the Fair Treatment Report when the temporary assignment was made. Even if she had, she did not point to a causal connection between the Fair Treatment Report and the temporary assignment to Station 4. The only possible basis for causation here is temporal proximity. "Temporal proximity between the protected activity and the

adverse action can establish causation if it is 'very close.'"
*Baroudi v. Sec'y, U.S. Dep't of Veterans Affairs*, 616 F. App'x
899, 902 (11th Cir. 2015) (per curiam) (quoting *Thomas v. Cooper
Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).  Where
temporal proximity is the only basis for causation, "a delay of
three to four months is too long, as a matter of law, to
establish causation by temporal proximity."  *Id.*  Here, there
was a three-month delay between Clemmons's Fair Treatment Report
follow-up letter and the temporary transfer.  Given this delay
and the lack of any other evidence, the Court finds under the
circumstances presented here that Clemmons has failed to present
sufficient evidence to create a genuine factual dispute on
causation, and thus her retaliation claims based on the
temporary assignment to Station 4 fail.

## VIII.    Light Duty Request

Clemmons does not dispute that she became unable to drive
the fire truck due to anxiety.  Clemmons acknowledges that in
September 2014, when she tried to return to work, she had a
doctor's note which stated she was incapable of driving the fire
truck.  Clemmons also concedes that driving a fire truck is an
essential function for a firefighter.  Therefore, to the extent
that Clemmons claims that CCG discriminated or retaliated
against her by failing to return her to full duty despite her
inability to drive the fire truck, that claim fails.

32

Clemmons claims that Streeter improperly required her to exhaust all but ten days of her accrued leave before being assigned to light duty, as required by CCG's Light-Restricted Duty Assignment Policy for off-duty injuries. Clemmons contends that she suffered anxiety due to on-the-job harassment, so the policy that applies to personnel injured while on duty should have applied to her. In support of her argument, Clemmons pointed to the deposition testimony of her physician, who testified that Clemmons reported to him that she had anxiety because she felt that she was being subjected to discrimination at work. Dominguez Dep. 27:1-28:10, ECF No. 26. Clemmons did not point to any evidence of precisely what the doctor's note said.[8]

Clemmons did not present any evidence to suggest that Streeter's decision to classify Clemmons's anxiety as an off-duty injury was motivated by her gender or by retaliatory animus. She did not point to any evidence that a similarly situated male employee immediately received a light-duty assignment based on a diagnosis of anxiety. She also did not point to any evidence that Streeter was aware of any protected activity when he made the decision to classify Clemmons's anxiety as an off-duty injury.

---

[8] As discussed in more detail below, Clemons did not point to evidence that she was subjected to actionable harassment.

Clemmons also did not point to any evidence that any other firefighters who became unable to work due to anxiety caused by the stress of their job were categorized as on-duty injuries rather than off-duty injuries. Clemmons does assert that L.G., a white female fire medic, was treated more favorably than she was. Clemmons contends that L.G. suffered from anxiety and was permitted to go on light duty without exhausting any of her leave. If that were true, and if Clemmons had pointed to some evidence to show that L.G. and Clemmons were similarly situated with regard to their injury and the response to it, then such evidence might support a prima facie case of race discrimination. But the record does not support this contention. Rather, CCG presented evidence that when L.G. expressed to her battalion chief that she was unable to perform her duties as a medic due to stress (including work-related stress), the battalion chief placed her on administrative leave—not light duty. Def.'s Reply Br. Ex. A, Letter from Glen Bahde to Jeff Meyer (Aug. 28, 2012), ECF No. 32-1. L.G. was permitted to return to work once she completed counseling. Def.'s Reply Br. Ex. B, Mem. from Mark Strunk to Tom Barron (Sept. 11, 2012), ECF No. 32-2. In sum, Clemmons did not establish that she was similarly situated to L.G. (or anyone else) but was treated differently. For these reasons, CCG is entitled to summary judgment as to Clemmons's claims based on her contention that

Streeter should have classified her anxiety as an on-the-job injury.

## IX. Additional Training

Clemmons claims that she was treated differently than similarly situated male firefighters when she was required to complete and pass annual pump training in January 2015. Clemmons does not dispute that firefighters, including her, must complete and pass annual pump training. She also does not appear to dispute that all of the firefighters who were permanently assigned to Station 14 had to complete and pass the annual pump training. Clemmons does, however, contend that several male firefighters were not required to pass the pump test when they were on a temporary assignment to Station 14. The mandatory annual pump training that was required of all firefighters permanently assigned to Station 14 was not an adverse employment action or a materially adverse employment action, even if the temporarily assigned firefighters were not required to complete it while they were at Station 14. Clemmons's claims based on the annual pump training thus fail.

Clemmons also argues that the additional driving training she had to complete upon returning to work in January 2015 was discriminatory and retaliatory. But Clemmons acknowledged that she had anxiety driving the truck—anxiety so severe that she could not work for several months. Her supervisor, Wherry, knew

that Clemmons had anxiety about driving the truck.  Clemmons did not point to evidence that there were any other employees who expressed a fear of driving the fire truck but were not required to do additional driving training.  There is simply no evidence that the additional driving training was because of Clemmons's race or gender or that it was in retaliation for protected activity.  There is also no evidence that the additional training amounted to an adverse employment action or a materially adverse action.  For these reasons, CCG is entitled to summary judgment on Clemmons's claims based on the additional driving training.

## X.   Restroom Duty

Clemmons claims that she was discriminated against based on her race and gender when she was required to clean two of the four restrooms at Station 14.  But the other firefighter on her squad, a white male, had to clean the other two restrooms. Clemmons failed to explain how this assignment was discriminatory or retaliatory.  The Court is also skeptical that this assignment could be an adverse employment action or a materially adverse action.  CCG is entitled to summary judgment on this claim.

## XI.  Meeting About the Case

Clemmons asserts that CCG discriminated against her based on her gender when Kinslow and Wherry had a short meeting with

her to ask her questions about her pending case. Clemmons believed that Kinslow and Wherry were being nosy, and she replied that she could not talk about the case. When Clemmons asked if she could leave, the meeting was over. This short meeting, which Clemmons attributes to her supervisors' nosiness, certainly does not rise to the level of an adverse employment action based on Clemmons's gender. CCG is entitled to summary judgment on this claim.

## XII. Hostile Work Environment

Clemmons claims that she was subjected to a hostile work environment based on the following conduct:[9]

- A handful of statements Wherry made to other employees at some unspecified time which suggested to Clemmons that Wherry had a complex about women in the fire department.

- A comment by D.G., the engineer who no longer works at the fire department, who stated in her presence that he believed women should not work in the fire department.

- A 2012 comment by C.D., who is no longer in her squad, that women should be at home, barefoot and pregnant.

- The movement of her belongings.

- The one-shift assignment to Station 4.

- The annual pump training and the additional driving training.

- The restroom cleaning assignment.

---

[9] CCG argues that Clemmons did not assert a harassment claim because she did not include it as a separate count in her Amended Complaint. But she did allege that she was subjected to harassment, so the Court will evaluate the claim.

"To establish a claim of a hostile work environment, an employee must prove that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248 (11th Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To prove a harassment claim, an employee must show (1) she "is a member of a protected class;" (2) she "was subjected to unwelcome . . . harassment;" (3) "the harassment was based on" her race, gender, or protected activity; (4) "the harassment was severe or pervasive enough to alter the terms and conditions of [her] employment and create a discriminatorily abusive working environment;" and (5) "the employer is responsible for the environment under a theory of either vicarious or direct liability." *Id.* at 1248-49.

This case is a far cry from a case like *Jones v. UPS Ground Freight*, where the Eleventh Circuit concluded that a black truck driver presented sufficient evidence of a hostile work environment where the truck driver's co-worker stated that he had trained "your kind" before, co-workers repeatedly left banana peels on his truck, co-workers wore shirts and hats displaying Confederate flags, and co-workers approached him with a crowbar and asked if he had reported them for the banana peels

and Confederate flags. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299-1301, 1304 (11th Cir. 2012). In contrast, here, Clemmons did not demonstrate a discriminatory or retaliatory motive for the movement of her belongings, the one-shift assignment to Station 4, the annual pump training, the additional driving training, or the restroom cleaning assignment. Even if she had, the Court cannot conclude that these actions plus a handful of comments made by one supervisor and two colleagues (mainly to others) over several years were severe or pervasive enough to alter the terms and conditions of Clemmons's employment and create a hostile work environment. Thus, CCG is entitled to summary judgment on Clemmons's hostile work environment claim.

CONCLUSION

As discussed above, Clemmons did not submit sufficient evidence to create a genuine fact dispute on any of her claims against CCG. CCG's summary judgment motion (ECF No. 21) is therefore granted.

IT IS SO ORDERED, this 22nd day of November, 2016.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA